**United States District Court**
For the Northern District of California

**\*E-Filed 07/16/2010\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

KAROL DAVENPORT,                                    No. C 10-0679 RS

          Plaintiff,                          **ORDER GRANTING DEFENDANTS'**
  v.                                                    **MOTION TO DISMISS**

LITTON LOAN SERVICING, LP, et al.,

        Defendants.
_____/

## I.   INTRODUCTION

This is a case about a home.  The parties are before this Court because they fundamentally disagree as to who may claim the legal entitlement to it.  Plaintiff advances twenty-six causes of action against her original lender, First Financial & Real Estate Services ("First Financial"), the current servicer of her loan, Litton Loan Servicing, LP ("Litton"), the original trustee, Credit-Based Asset Servicing and Securitization, LLC ("C-BASS"), the company who purchased her home at foreclosure sale, U.S. Bank, North America ("U.S. Bank"), and others.  Among her federal claims are alleged violations of the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and the Federal Regulations thereto as well as the Real Estate Settlement Procedures Act ("RESPA"), 12

**United States District Court**
For the Northern District of California

U.S.C. § 2601, *et seq.*.  She also raises numerous other claims grounded on California statutory and common law.  Defendants Litton, C-Bass and U.S. Bank move to dismiss.

## II.  RELEVANT FACTS

The property in dispute is located at 2836 Canterbury Drive in Richmond, California. Plaintiff Karol Davenport resides there.  In 2006, Davenport was sixty-two years old.  She was then and has remained unmarried.  Davenport explains that she is a medical examiner by trade.  Through this work, she grosses roughly $1,000 each month.  A Social Security payment of $1,197 augments her monthly income.  In September of 2006, she recounts in her First Amended Complaint ("FAC") that her then-lender Citigroup (who, incidentally, is not a party in this case) contacted her by telephone.  A representative of that bank apparently warned her that, should she refuse to refinance her existing loan, she would likely lose her home.  The representative duly referred Davenport to the services of another lender, First Financial, a named defendant which has not as yet made an appearance in this action.

Davenport dealt largely with a First Financial employee named Kruger.  In their first telephone conversation, she suggests Kruger responded to her desire to refinance with great enthusiasm.  He gathered personal information, including her age, race, marital status and income. She avers she responded truthfully.  Even so, she notes that Kruger overstated her monthly income by $2,200 on a loan application form.  Kruger also explained that she would be eligible for a fixed rate loan for three years at 6.125%.  While he noted that the rate would eventually adjust, she insists he assured her that it would be possible—indeed, easy—to refinance in the future.  Soon after, First Financial sent a packet of information detailing the prospective loan to Davenport by fax.  Kruger then explained the meaning of each page to Davenport over the telephone.  She contends she emphasized that she would not agree to prepayment penalties or a balloon payment option; according to Davenport, Kruger assured her that such requests would "not be a problem."  (Compl. ¶ 24.)  Attached to the final loan documents that she ultimately signed is a balloon payment rider.

Three days later, Davenport received by mail a thirty page loan agreement with explicit instructions from First Financial requiring her signature within seventy-two hours.  She contends

United States District Court

For the Northern District of California

1   she found the language in the document baffling and overwrought; she says she was, at the very

2   least, unsure if its terms were identical to those she discussed with Kruger.  When she tried to

3   contact him, he responded only on the third and last day.  At that time, she insists he assured her that

4   the longer document reflected their telephone conversation.  When Davenport pointed out that

5   several pages were not filled out, Kruger explained it was customary for the lender to complete the

6   missing information after the borrower signed and returned the paperwork.  Davenport did sign the

7   loan (in the presence not of anyone from First Financial—she points out—but an impatient and

8   fidgety notary instead) and returned the paperwork within the seventy-two hour period.  A week

9   later, the loan closed.  It was secured by a deed of trust on the property and duly recorded in Contra

10  Costa County on December 5, 2010.  Upon subsequent consultation with a forensic accountant in

11  2009, Davenport contends she only then learned that First Financial failed to provide certain

12  disclosures required by TILA and RESPA.[1]

13         Plaintiff insists she faithfully satisfied her monthly loan obligations for three years until

14  January of 2009, at which point she was not able to do so.  Davenport admits she defaulted.  She

15  does explain, however, that she attempted to negotiate a refinance agreement with Litton, the loan

16  servicer.  According to Davenport, Litton "in bad faith" refused.  On April 9, 2009, Quality Loan

17  Service recorded a notice of default on behalf of C-BASS; it recorded a notice of sale on July 13,

18  2009.  Davenport suggests that, while she did receive copies of these notices by mail, defendants did

19  not fully comply with the requirements of California Civil Code section 2924.  Specifically, she

20  points out that the notices were not sent via certified mail.  Moreover, Davenport claims that Litton

21  also did not discuss alternatives to foreclosure as required by California Civil Code section 2923.5

22  and the federal Homeowner Affordable Modification Program ("HAMP") guidelines.  Litton

---

[1] Defendants point out that Davenport seems to contradict herself with regard to the required disclosures.  In paragraph thirty-six of the FAC, for example, she writes, "First Financial provided Plaintiff a different TILA statement than what was originally provided to Plaintiff and overstated the finance charge by $313.04.  Moreover, First Financial failed to provide Plaintiff the TILA required Right to Cancel, and final Hud-1 Statement."  Defendants suggest she has therefore both claimed to have received TILA disclosures (albeit, inaccurate or imperfect ones) and entirely denied having received them.  This is a belabored and too-exacting reading of the FAC.  A fair reading suggests she means to assert that she did not receive *all* required disclosures and, as to the ones she did receive, she suspects they were not adequate.

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

counters that it *did* consider Davenport's options and insists that no law, cited or otherwise, *requires* a lender to refinance.

The defendants held a trustee's sale on August 13, 2009 and U.S. Bank purchased the property.  On September 2, 2009, U.S. Bank served Davenport with a notice to vacate.  She commenced this action on December 7, 2009.

III. DISCUSSION

A.   Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts a plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff.  *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  Dismissal is appropriate where a complaint lacks "a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted).  In the context of a Rule 12(b)(6) motion, a district court generally may not consider material beyond the pleadings.  *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984).  The exception is material which is properly submitted as part of the complaint. *Amfac Mtg. Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 429-30 (9th Cir. 1978).  Here, a copy of the deed of trust and a notice of foreclosure were submitted as part of the FAC.

To state a claim for relief, Federal Rule of Civil Procedure 8(a)(2) demands that a pleading include a "short and plain statement of the claim showing that the pleader is entitled to relief."  The Supreme Court has instructed that this mandate does not require "detailed factual allegations," but "demands more than an unadorned, the-defendant-harmed-me accusation" or "naked assertion[s] devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The tenet that allegations are construed in a light favorable to the plaintiff does not apply, however, to bare legal conclusions.  *Twombly*, 550 U.S. at 555 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Even

United States District Court

For the Northern District of California

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

United States District Court

For the Northern District of California

1  where the plaintiff alleges something more than a bare legal conclusion, *Twombly* requires a

2  statement of a plausible claim for relief. *Id.* at 544.  Weighing a claim's plausibility is ordinarily a

3  task well-suited to the district court but, where the well-pleaded facts do not permit the court to infer

4  more than a mere *possibility* of misconduct, the complaint has not shown the pleader is entitled to

5  relief. *Iqbal*, 129 S. Ct. at 1950.

6      B.  Federal Rule of Civil Procedure 9(b)

7      Federal Rule of Civil Procedure 9(b) provides that "[i]n allegations of fraud or mistake, a

8  party must state with particularity the circumstances constituting fraud or mistake."  To satisfy the

9  rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct.

10  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).  In other words, "the circumstances

11  constituting the alleged fraud must be specific enough to give defendants notice of the particular

12  misconduct so that they can defend against the charge and not just deny that they have done

13  anything wrong." *Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).  By

14  contrast, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

15  generally." Fed. R. Civ. Pro. 9(b).  Moreover, "[i]n the context of a fraud suit involving multiple

16  defendants, a plaintiff must, at a minimum, identif[y] the role of [each] defendant[ ] in the alleged

17  fraudulent scheme."  *Swartz v. KPMG, LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (*quoting Moore v.

18  Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

19                    IV. DISCUSSION

20      A.  TILA: Fourteenth Claim for Relief

21      Defendants first move to dismiss Davenport's claim for rescission and statutory damages

22  under TILA as time-barred.  Congress enacted TILA to promote the "informed use of credit" by

23  consumers. 15 U.S.C. § 1601(a); *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 235

24  (2004).  "TILA's disclosure provisions seek to ensure meaningful disclosure of credit terms."

25  *Household Credit*, 541 U.S. at 235 (citations and internal quotation marks omitted).   To this end,

26  "the Act requires creditors to provide borrowers with clear and accurate disclosures of terms dealing

27  with things like finance charges, annual percentage rates of interest, and the borrower's rights."

28

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

*Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998).  Federal Regulation Z, 12 C.F.R. 226, *et seq.*, further details the information creditors must disclose as well as the timing therein (where, depending on the transaction, consumers might benefit not merely from initial but also periodic disclosures).

Failure to comply with the Act subjects a lender to criminal penalties for noncompliance, *see* § 1611, as well as to statutory and actual damages, *see* § 1640.  An action for damages "may be brought" within one year after a violation of the Act.  § 1640(e); *Ocwen*, 523 U.S. at 412.  A TILA violation occurs on "the date of consummation of the transaction," *King v. California*, 784 F.2d 910, 915 (9th Cir. 1986), and "consummation" means "the time that a consumer becomes contractually obligated on a credit transaction," 12 C.F.R. § 226(a)(13).  TILA also authorizes a borrower whose loan is secured with his or her "principal dwelling," to rescind the loan entirely "until midnight of the third business day following the consummation of the transaction . . . ." § 1635(a).  Where the creditor fails to make the requisite disclosures, the borrower is not "liable for any finance or other charge, and any security interest given by [him], including any such interest arising by operation of law, becomes void" upon rescission.  § 1635(b).  The borrower's right of rescission "expire[s] three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first." § 1635(f).  Here, Davenport signed the deed of trust and "consummated" the loan on November 22, 2006.  Her home was sold at foreclosure in September of 2009 and she filed the instant action in early December of that year.

Davenport seeks statutory damages pursuant to section 1640 and seeks to exercise the right to rescind her loan under section 1635(f).  Specifically, Davenport suggests she did not receive the "initial" disclosures required under the Act.  Presumably, she refers to disclosures that must accompany certain loan *applications*.  *Compare* § 1638(b) (discussing disclosures that accompany loan application) *with* § 1638(b)(2)(B)(iii) (discussing final disclosures that accompany *consummation* of loan).  As to the disclosures she acknowledges she did receive (again, she does not specify at what point or in what context she received them), she contends that they were inconsistent and inadequate.  She alleges, for example, that the statements differed in their recitations of the total

1    payment owed by approximately $438,984.  (Compl. ¶138.)  *See* § 1638(a)(5) ("The sum of the

2    amount financed and the finance charge, which shall be termed the 'total of payments' . . . .").

3    Finally, she insists First Financial misrepresented the finance charge contemplated in section

4    1638(a)(3).

5         Defendants insist that, in any event, her TILA claims are time-barred.  At least with respect

6    to her attempt to rescind, they are correct.  In *Beach v. Ocwen Federal Bank*, the Court noted that

7    section 1635(f)—which provides that a borrower's right to rescind under the Act "shall expire" after

8    three years or foreclosure sale—represents an unequivocal Congressional mandate limiting exercise

9    of the right to a time inside the statutory period.  Accordingly, it is not possible for Davenport to

10   rescind; her claim, to the extent it seeks the remedy of rescission, therefore must be dismissed

11   without leave to amend.

12        By contrast, the Ninth Circuit has noted that equitable tolling may be appropriate where a

13   plaintiff seeks statutory damages under section 1640.  *King v. California*, 784 F.2d 910, 913 (9th

14   Cir. 1986).  A district court may grant a motion to dismiss on statute of limitations grounds "only if

15   the assertions of the complaint, read with the required liberality, would not permit the plaintiff to

16   prove that the statute was tolled."  *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153 (9th Cir.

17   2000) (*quoting Tworivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)).  "Equitable tolling may be

18   applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the

19   existence of his claim."  *Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000); *Leong v.

20   Potter*, 347 F.3d 1117, 1123 (9th Cir. 2003) (noting that the doctrine "focuses on a plaintiff's

21   excusable ignorance and lack of prejudice to the defendant").  Moreover, "the applicability of

22   equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule

23   12(b)(6) motion to dismiss (where review is limited to the complaint) if equitable tolling is at issue."

24   *Huynh v. Fidelity Fed. Bank*, 465 F.3d 992, 79, 1003-04 (9th Cir. 1996) (*citing Supermail v. United

25   States*, 68 F.3d 1204, 1206 (9th Cir. 1995)).

26        Beyond Davenport's assertion that some disclosures were never made or that the figures that

27   were disclosed were erroneous, she does not actually present any facts to explain why she was

28

United States District Court

For the Northern District of California

1    unable to discover the discrepancies within the statutory period.  Indeed, she notes that she first

2    realized the errors occurred through consultation with a forensic accountant (which is, of course, a

3    clear example of due diligence).  She simply fails to offer any explanation for why she did not or

4    was otherwise unable to pursue this course within the one-year statutory framework.  Accordingly,

5    her claim for statutory damages under TILA must be dismissed.  She may amend her FAC  if she

6    can in good faith present a factual basis for equitable tolling.

7          B.  RESPA: Fifteenth Claim for Relief

8          Defendants also move to dismiss Davenport's RESPA claim.  Although she does not

9    specifically cite to a section of RESPA,[2] it seems likely Davenport means to rely on the sections that

10   contemplate disclosures, such as sections 2603 and 2604.  Davenport asserts, first, that First

11   Financial failed to provide her with an initial good faith estimate of all settlement charges (a "GFE")

12   and, second, that the series of GFEs it eventually did provide were "misleading and conflicting."

13   (Compl. ¶ 147.)

14         Section 2604 contemplates "a good faith estimate of the amount or range of charges for

15   specific settlement services the borrower is likely to incur in connection with the settlement."  12

16   U.S.C. § 2604.  *See also* 12 U.S.C. § 2603 (contemplating a good faith estimate of charges at or

17   before settlement).  An accompanying regulation, 24 C.F.R. 3500.7(c)(2) ("Regulation X"), further

18   details that the lender must provide mortgage applicants with such a "good faith estimate" of "each

19   charge which . . . the borrower will normally pay or incur at or before settlement based upon

20   common practice in the locality of the mortgaged property."  The lender must do so within three

21   days of receipt of a loan application.  24 C.F.R. 3500.7(a)(1).  Lenders may revise and resubmit a

22   GFE, but must do so under the explicit time and notice restraints.  24 C.F.R. 3500.7(f).  Moreover, a

23   violation under the subsection operates as a violation of section 2604.  24 C.F.R. 3500.7(i).

24          Defendants argue that Davenport cannot state a claim for relief, as the section of RESPA on

25   which she relies does not contemplate a private right of action.  Courts in this district have analyzed

26

27   _____

[2] RESPA requires mortgage lenders to disclose the costs associated with real estate closings.  12
U.S.C. § 2601 (1994).  The statute aims to ensure that prospective home owners are informed and

28   able to sidestep "unnecessarily high settlement charges caused by certain abusive practices . . . ."  *Id.*

RESPA's structure and persuasively reasoned that Congress did not intend to create a private right of action for the sections that contemplate disclosure violations. *See, e.g.*, *Bloom v. Martin*, 865 F. Supp. 1377, 1834 (N.D. Cal. 1994). As the district court in *Bloom* reasoned, "this intent is evident from Congress' decision to provide private remedies for violations of several sections of RESPA." Specifically, sections 2607 and 2609 provide for treble damages and attorneys' fees. By contrast, RESPA sections 2603 and 2604 do not contain any such provisions. As *Bloom* recognized: "The inclusion of remedies in certain RESPA provisions and their omission in others is indeed strong evidence that Congress did not intend to provide a private remedy for violations of section 2603." *Id.* (*citing Transam. Mortgage Advisors v. Lewis*, 444 U.S. 11, 21 (1979) (holding that omission of private remedies in subsequent version of a securities statute "strongly suggest[ed]" that Congress did not intend to create a private right of action)). *See also Gusenkov v. Washington Mut. Bank*, No. C 09-04747, 2010 WL 2612349, at *5 (N.D. Cal. June 24, 2010); *Lima v. Wachovia Mortg. Corp.*, No. 09-04798, 2010 WL 1223234, at *7 (N.D. Cal. Mar. 25, 2010) (rejecting RESPA claim where plaintiff alleged only that lender failed to provide good faith estimate on grounds that RESPA does not provide a private right of action for this disclosure violation). Accordingly, Davenport's RESPA claim is dismissed with leave to amend. If she intended to rely on another section of the Act, she must make this clear in any amended complaint.

C. Fair Housing Act & Equal Credit Opportunity Act: Twenty-first and Twenty-Second Claims for Relief

Next, defendants move to dismiss Davenport's claim that one or more of the defendants engaged in a practice of "red-lining," or the intentional targeting of a disadvantaged group with an unfavorable loan package, in violation of the Fair Housing Act ("FHA") and/or the Equal Credit Opportunity Act ("ECOA"). Although she does not cite to any particular section of the FHA or the ECOA, the likeliest sections to which her "reverse-redlining" allegations refer are 42 U.S.C. § 3605 and 15 U.S.C. § 1691. Section 3605 of the FHA deems it unlawful "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a

United States District Court

For the Northern District of California

1   transaction, because of race, color, religion, sex, handicap, familial status, or national origin . . . ."

2   42 U.S.C. § 3605(a).  For its part, section 1691(a)(1) provides that a creditor may not lawfully

3   discriminate against any applicant "on the basis of race, color, religion, national origin, sex or

4   marital status, or age (provided the applicant has the capacity to contract)."  A plaintiff must bring

5   any civil action under the FHA or the ECOA within two years of the alleged violation.  42 U.S.C. §

6   3613(a)(1)(A); 15 U.S.C. § 1691e(f).

7          Davenport's claim hones in on the origination and consummation of her loan, which

8   culminated in November of 2006.  As the defendants point out, the statutory filing period has

9   passed.  In *Havens Realty Corporation v. Coleman*, the Supreme Court reasoned that "where a

10  plaintiff, pursuant to the FHA, challenges not just one incident of conduct violative of the Act, but

11  an unlawful practice that continues into the limitations period, the complaint is timely . . . ."  455

12  U.S. 363, 381-82 (1982).  Numerous other courts have acknowledged that such a "continuing

13  violation" theory applies in the ECOA context as well.  *See, e.g.*, *Ramirez v. GreenPoint Mortg.*

14  *Funding, Inc.*, 633 F. Supp. 2d 922, 929-30 (N.D. Cal. 2008).  Here, however, Davenport has not

15  advocated for or presented facts to suggest any unlawful conduct extended beyond November of

16  2006.  Accordingly, there is no basis for the adoption of a "continuing violation" approach to her

17  claims and her FHA and ECOA claims are dismissed with leave to amend.

18         The pleadings are lean notwithstanding the statute of limitations problem.  In the interest of

19  efficiency (should Davenport choose to amend her FAC), they are addressed here.  The concept of

20  "reverse-redlining" refers to a discriminatory practice whereby a lender unlawfully extends credit to

21  a neighborhood or class of people, typically within a specific geographic area, on terms less

22  favorable than would have been extended to persons outside the particular class at issue.  *See Hafiz*

23  *v. Greenpoint Mortg. Funding*, 652 F. Supp. 2d 1039, 1045 (N.D. Cal. 2009); *Hargraves v. Cap.*

24  *City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000).  Courts have only recently begun to treat

25  reverse-redlining claims as cognizable under the FHA and the Ninth Circuit has not had an

26  opportunity to rule on the matter.  Where plaintiffs have raised reverse-redlining claims, courts have

27  applied a four-part test to determine whether the claim is sufficiently pleaded.  The plaintiff must

28

**United States District Court**
For the Northern District of California

1    allege: (1) that she is a member of a protected class; (2) that she applied and was qualified for a

2    loan; (3) that the loan was given on grossly unfavorable terms; and (4) that the lender either

3    intentionally targeted her for unfair loans or currently makes loans on more favorable terms to

4    others. *Hafiz*, 652 F. Supp. 2d at 1046 (*citing Munoz v. Int'l Home Cap. Corp.*, No. 03-01009, 2004

5    WL 3086907, at *4 (N.D. Cal. May 4, 2004)).

6            In her FAC, Davenport advances a somewhat circular reverse-redlining theory: she

7    concludes the very practice of "reverse-redlining" automatically "shows defendants intentionally

8    targeted" her on the basis of "age, race, color and/or sex." (Compl. ¶ 186.)  Unfortunately, she

9    provides no further explanation.  Viewed as a whole, however, the FAC does allege that Davenport

10   was a member of a protected class, that she applied and was qualified for the 2006 loan,[3] and that its

11   terms were grossly unfavorable.  As to the final element—direct targeting or evidence of loans made

12   to others on more favorable terms—her factual presentation is absent.  Elsewhere in the FAC, she

13   does note that Citibank originally contacted her with the strong encouragement that she refinance

14   her mortgage in 2006.  According to Davenport it was only then that she sought out First Financial.

15   She claims she did so in response to a referral by Citibank.  This is as close to an allegation of direct

16   targeting as appears in the FAC.  It says nothing about other lenders.  The inference that First

17   Financial somehow choreographed Citibank's direct solicitation for its own benefit is, based on

18   these pleadings, a stretch.  She has not, then, pleaded "enough facts to state a claim for relief that is

19   plausible on its face," *Twombly*, 127 S. Ct. at 1965.  Even without the statute of limitations problem,

20   Davenport's claim would not survive a motion to dismiss as pleaded.

21           *California Statutory Claims*

22       A.  California Civil Code §§ 1572 & 1573: Actual and Constructive Fraud: Seventh &

23           Eighth Claims for Relief

24

25   _____

     [3] Technically, one underlying theme of Davenport's FAC is that she was *not* actually qualified to
26   take out the subject loan.  This inconsistency with the pleading requirement of a FHA claim,
     however, is not dispositive.  She seems to argue that members of a protected class were intentionally
27   targeted and hoodwinked into agreeing to loans they could not afford.  Such an allegation falls
     within the spirit of the reverse-redlining concept.

28                                                                      No. C 10-0679 RS
                                                             ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1    Davenport's seventh and eighth claims focus on the origination of the 2006 loan and argue

2 all defendants' conduct was fraudulent.  Among other allegations, she asserts that the First Financial

3 employee, Kruger, significantly overstated her monthly income on a loan application document.  As

4 a result, she reasons that she was approved for and ultimately entered into a loan she was unable to

5 afford.  Davenport argues the remaining defendants were also somehow involved either in this

6 single incident or in an overarching fraudulent course of conduct.  While the behavior of First

7 Financial and its agent Kruger are likely pleaded with sufficient particularity for purposes of Rule

8 9(b), the allegations against Litton, C-BASS and U.S. Bank are not.  Rule 9(b) requires

9 particularized allegations of the circumstances constituting fraud.  A plaintiff may not merely lump

10 together multiple defendants.  *Swartz v. KPMG, LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (*quoting*

11 *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).  As currently

12 composed, the pleadings do not inform each defendant separately of *its* alleged fraudulent conduct.

13 These claims are dismissed as to defendants Litton, C-Bass and U.S. Bank with leave to amend.

14    B.  <u>California Civil Code Sections 2924 & 2923.5: Eleventh Claim for Relief</u>

15    Defendants also challenge Davenport's claim that the foreclosure process violated two

16 provisions of the California Civil Code with respect to its guidelines for non-judicial foreclosure

17 procedures.[4]  California Civil Code section 2924 requires that a trustee must notify an owner or

18 borrower before a foreclosure sale may proceed.  Davenport admits she received a timely notice of

19 default and, later, notice of the trustee's sale but argues that C-BASS failed to send these notices via

20 registered or certified mail.  When attacking a non-judicial foreclosure sale, a borrower must

21 overcome a presumption of propriety.  *Knapp v. Doherty*, 123 Cal. App. 4th 76, 86 n.4 (2004).  She

22 may do this by proving an improper procedure occurred and by demonstrating resulting prejudice.

23 *Id.*  Even assuming the failure to certify or register the notice was improper, Davenport has neither

24 shown resulting prejudice nor even alleged it exists.

25

26 ───────────────────

27 [4] Davenport grounds her eleventh claim for relief under section 2923.5.  Elsewhere in the FAC, she discusses an alleged 2924 violation.  Even though she does not include the provision anywhere in the caption, the Order assumes that she wished to raise the issue and so discusses it here.

28

**United States District Court**
For the Northern District of California

1      California Civil Code section 2923.5 provides that a "mortgagee, trustee, beneficiary, or

2  authorized agent may not file a notice of default pursuant to section 2924 until 30 days after contact

3  is made as required by paragraph two "or 30 days after satisfying the due diligence requirements as

4  described in subdivision (g)." Cal. Civ. Code § 2923.5(a)(1).  As defendants point out, the section

5  does not actually require that a lender modify a defaulting borrower's loan.  Instead, it contemplates

6  contact and some analysis of the borrower's financial situation.  Litton (the party who apparently

7  considered and then rejected Davenport's modification request) argues it *did* contact Davenport and

8  *did* consider a modification.  For her part, Davenport discusses in her FAC how she and her legal

9  counsel discussed modification with Litton.  Ultimately, Litton rejected the possibility.  Because the

10  facts pleaded actually negate a claim that section 2923.5 was violated, it is dismissed.

11      Defendants also suggest that Davenport's section 2923.5 claim must be dismissed without

12  leave to amend.  For support, they point to a recent opinion from the California Court of Appeals,

13  *Mabry v. Superior Court*, in which the court extensively reviewed section 2923.5 and persuasively

14  reasoned that the remedy for a violation is postponement of a foreclosure sale.  185 Cal. App. 4th

15  208, 235 (2010).  Where foreclosure sale has already occurred, though, the court noted that a section

16  2923.5 violation does not affect the title: "There is nothing in section 2923.5 that even hints that

17  noncompliance with the statute would cause any cloud on title after an otherwise properly conducted

18  foreclosure sale." *Id.*  "[U]nder the plain language of section 2923.5, read in conjunction with

19  section 2924g, the only remedy provided is a postponement of the sale before it happens." *Id.*  As

20  the Canterbury property was already sold at foreclosure, it does not appear that any remedy remains

21  under the provision.  Accordingly, her section 2923.5 claim is dismissed without leave to amend.

22      C.  California Business & Professions Code section 17200: Tenth Claim for Relief

23      In her tenth claim for relief, Davenport charges all defendants with violations of the "unfair"

24  prong of California's Unfair Competition Law ("UCL").  Cal. Bus. & Prof. Code § 17200.

25  California's UCL prohibits acts or practices that are: (1) fraudulent; (2) unlawful; or (3) unfair. *Id.*

26  Each prong of the UCL constitutes a separate and distinct theory of liability. *Kearns v. Ford Motor*

27  *Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  "A business practice is unfair within the meaning of the

28

1  UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous

2  and causes injury to consumers which outweighs its benefits." *McKell v. Wash. Mut., Inc.*, 49 Cal.

3  Rptr. 3d 227, 240 (2006).[5]

4       Davenport focuses solely on loan origination and characterizes that process as "unfair"

5  insofar as defendants: (1) employed "bait and switch tactics"; (2) "ma[de] loans without providing

6  borrowers with sufficient, accurate and understandable information regarding the terms and

7  conditions of the loan"; (3) failed to provide "borrowers with sufficient, accurate and understandable

8  information regarding the nature and extent of the financial risk" involved; and (4) failed to consider

9  Davenport's ability to repay her loan.  More narrowly, Davenport highlights the fact that Kruger

10  overstated her income in a loan application form so that she would "qualify" for the loan she

11  received.  Assuredly, this practice qualifies as "unfair" (more than this, she has also adequately

12  alleged elsewhere that it is unlawful).  As alleged against First Financial, Davenport appears to have

13  adequately pleaded an unfair business practice under the UCL.  What she has failed to do, though, is

14  connect the moving defendants to these loan origination practices.  Accordingly, her claim must be

15  denied as to the moving parties with leave to amend.

16       D.  The Elder Abuse Act: Twentieth Claim for Relief

17  _____

18  [5] Historically, California courts subjected a plaintiff's UCL unfairness claims to a balancing test.
Under that test, determining whether a business practice is unfair "involves an examination of [that
19  practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of
the alleged wrongdoer.  In brief, a court weighs the utility of the defendant's conduct against the
20  gravity of the harm to the alleged victim."  *McKell*, 49 Cal. Rptr. 3d at 240  (alterations in original
and citations omitted).  In *Cel-Tech Commcationn, Inc. v. Los Angeles Cellular Telephone*
21  *Company*, the California Supreme Court rejected that test and instead held that in a claim brought by
a competitor, "any finding of unfairness . . . [must] be tethered to some legislatively declared
22  policy."  20 Cal. 4th 163, 185 (1999).  Yet, because *Cel-Tech* expressly limited its holding to
competitor lawsuits, the appropriate test to determine whether a practice is "unfair" in a consumer
23  case under California law remains uncertain.  *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d
718, 735 (9th Cir. 2007) ("California's unfair competition law, as it applies to consumer suits, is
24  currently in flux . . . .").  *Compare Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal. App.
4th 700, 720 n.23 (2001) ("[W]e are not to read *Cel-Tech* as suggesting that such a restrictive
25  definition of 'unfair' should be applied in the case of an alleged consumer injury . . . .") *with Scripps
Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003) (requiring, under *Cel-Tech*, that any
26  UCL claim must be tethered to a legislatively declared policy).  The Ninth Circuit has observed that
these two options—to apply *Cel-Tech* directly to consumer cases and require that the unfairness be
27  tied to a "legislatively declared" policy as in *Scripps Clinic*, or to adhere to the former balancing test
as stated in cases such as *Motors, Inc.*—are not mutually exclusive.  *Lozano*, 504 F.3d at 736.

28

United States District Court

For the Northern District of California

1    Davenport relies on California's Elder Abuse Act for the argument that all defendants

2  committed actionable financial abuse.  As a general matter, a plaintiff must demonstrate that a

3  defendant: (1) subjected an elder to statutorily-defined physical abuse, neglect, or financial abuse;

4  and (2) acted with recklessness, malice, oppression, or fraud in the commission of the abuse.  *See*

5  *Von Mangolt Hills v. Intensive Air, Inc.*, No. 06-03300, 2007 WL 52122, at *2 (N.D. Cal. Feb. 15,

6  2007).

7    Defendants point out, first, that Davenport was not an "elder" as defined by the statute, at

8  least at the time she consummated her loan.  *See* Cal. Welf. & Inst. Code § 15610.27 (defining elder

9  as a person over the age of sixty-five).  While her elder abuse arguments do indeed focus only on

10  loan consummation, it is at least possible that she also references the failed modification attempt or

11  the foreclosure events.  By that time, she might have qualified as an elder under the statute.  Because

12  Davenport has not alleged these facts, though, she has not stated a "plausible" claim for relief; her

13  elder abuse cause of action is dismissed with leave to amend.

14    E.  California Civil Code Section 1691 Rescission: Sixteenth Claim for Relief

15    Defendants also move to dismiss Davenport's sixteenth claim for relief to rescind her loan

16  under state law.  Davenport relies on California Civil Code sections 1989(b)(1), (5) and (6) as well

17  as 1691.  Section 1989(b), respectively, allows a party to a contract to rescind where: (1) consent

18  was obtained by mistake, through duress, menace, fraud, or undue influence exercised by or with the

19  connivance of the adverse party; (5) where the contract is "unlawful for causes which do not appear

20  in its terms or conditions, and the parties are not equally at fault"; or (6) where the public interest

21  will be prejudiced by permitting the contract to stand.  Section 1691 governs rescission procedure.

22  It requires that a party give notice of his or her intent to rescind and "[r]estore to the other party

23  everything of value which he has received from him under the contract or offer to restore the same

24  upon condition that the other party do likewise." Cal. Civ. Code § 1691.  The statute provides that

25  when either notice of rescission has not been provided or restoration made, "the service of a

26  pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such

27  notice or offer or both."  Cal. Civ. Code § 1691.

28

No. C 10-0679 RS
Order Granting Defendants' Motion to Dismiss

1    To support her rescission claim, Davenport contends First Financial's alleged fraud provides

2   a basis for rescission.  In the FAC, Davenport states that she is willing to return the subject property

3   but does not otherwise offer to return the outstanding portion of her loan.  As an initial matter, it is

4   not clear that Davenport can substitute the property for the "thing of value" contemplated by the

5   contract (when she refinanced her original loan, Davenport received cash).  *See, e.g.*, *Garavito v.*

6   *G.E. Money Bank*, No. 08-2215, 2010 WL 744284, at *4 (S.D. Cal. Mar. 2, 2010) (rejecting

7   plaintiff's offer to quitclaim property to lender as a valid tender offer).  More importantly, the papers

8   indicate that the property has *already* been sold at foreclosure sale to U.S. Bank.  Accordingly, her

9   "offer" to return the property cannot realistically count as a tender offer (nor is it remotely consistent

10  with her plea for relief: to rescind the loan transaction, undo the foreclosure sale, and remain in her

11  home).

12    While this Court has repeatedly recognized that a borrower need not *allege* ability to tender

13  in support of a TILA rescission claim to survive a motion to dismiss, the rationale was tethered to

14  the Ninth Circuit's recognition that district courts have discretion to alter the rescission procedures

15  contemplated in that federal statute.  *Yamamoto v. Bank of New York*, 329 F.3d 1167, 1171 (9th Cir.

16  2003).  Accordingly, this Court has held that, while a borrower must ultimately demonstrate ability

17  to tender to prove a claim for TILA rescission on the merits, he or she need not allege this ability at

18  the pleading stage.  *See, e.g.*, *Botelho v. U.S. Bank*, No. 08-04316, 2010 WL 583954, at *5 (N.D.

19  Cal. Feb. 16, 2010).  It is not at all clear that this same leeway is appropriate in the context of

20  rescission under California Civil Code section 1691.  In contrast, courts in California continually

21  treat tender or at least the allegation of ability to do so as a necessary part of a valid claim for

22  rescission of a contract.  *See, e.g.*, *Periguerra v. Meridas Capital, Inc.*, No. 09-4748, 2010 WL

23  39593, at *3 (N.D. Cal. Feb. 1, 2010) ("Plaintiffs must allege that they are willing to tender the loan

24  proceeds to the lender.  This is a basic tenet of California contract law."); *Ritchie v. Cmty Lending*

25  *Corp.*, No. 09-02484, 2009 WL 2581414, at *3 (C.D. Cal. Aug. 12, 2009) ("[I]t is a 'basic rule' that

26  '[a]n offer of performance is of no effect if the person making it is not able and willing to perform

27  according to the offer.") (*quoting* Cal. Civ.Code § 1495 (2003)).  The rationale proceeds from the

28

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

United States District Court

For the Northern District of California

1    language of the statute, which requires that a party "[r]estore to the other party everything of value

2    which he has received from him under the contract or *offer* to restore the same . . . ."  Cal. Civ. Code

3    § 1691 (emphasis added).  Accordingly, it seems clear that Davenport must at least allege that she

4    has offered to tender to support a claim for equitable rescission under section 1691.  Davenport has

5    not, and she has therefore not adequately pleaded a claim for state law rescission.  This claim is

6    dismissed with leave to amend.

7            *California Common Law Claims*

8            A.  Declaratory Relief: First Claim for Relief

9            Although Davenport frames the "declaratory judgment" section of her FAC as a cause of

10   action, it is correctly understood as a form of relief.  Her *actual* claim is based on an ultimately

11   mistaken theory.  She contends that the defendants lacked the power to sell the Canterbury property

12   pursuant to the deed of trust because no defendant has physical possession of the promissory note.

13   As courts have repeatedly emphasized, such a theory is "unsupported and incorrect."  *Hafiz v.*

14   *Greenpoint Mortg. Funding*, 652 F. Supp. 2d 1039, 1043 (N.D. Cal. 2009).  Davenport's FAC refers

15   to each of the defendants in their capacities as lenders, servicers and trustees.  She attaches to her

16   FAC a copy of the refinancing agreement, the deed of trust and related documentation.  She does not

17   dispute that the parties are who they claim to be but insists that they must produce a physical copy

18   of the original note before exercising their contractual rights.

19           "California law does not require possession of the note as a precondition to non-judicial

20   foreclosure under a deed of trust . . . .  Pursuant to section 2924(a)(1) of the California Civil Code,

21   the trustee of a Deed of Trust has the right to initiate the foreclosure process.  Production of the

22   original note is not required to proceed with a non-judicial foreclosure."  *Id.* (*quoting Pagtalunan v.*

23   *Reunion Mortg. Inc.*, No. 09-00162, 2009 WL 961995, at *1 (N.D. Cal. Apr. 8, 2009).  Moreover,

24   the trustee has the power and the duty to initiate foreclosure proceedings on the property upon the

25   trustor's default.  *Lomboy v. SCME Mortg. Bankers*, No. 09-1160, 2009 WL 1457738, at *5 (N.D.

26   Cal. May 26, 2009).  This is what happened here.  C-BASS, as the named trustee in the deed of

27   trust, initiated the foreclosure proceedings.  Accordingly, the facts plaintiff alleges to support her

28

No. C 10-0679 RS
Order Granting Defendants' Motion to Dismiss

United States District Court

For the Northern District of California

1  declaratory relief theory could not possibly give rise to a cognizable legal claim.  Insofar as she

2  bases her twenty-third, twenty-fourth, twenty-fifth and twenty-sixth claims (to set-aside the

3  foreclosure sale, for a cancellation of the deed of trust, for permanent injunctive relief and a request

4  to quiet title) on the same "note holder" theory, these too are dismissed without leave to amend

5  against the defendants.

6        B.   Accounting: Second Claim for Relief

7        "A cause of action for an accounting requires a showing that a relationship exists between

8  the plaintiff and defendant that requires an accounting, and that some balance is due the plaintiff that

9  can only be ascertained by an accounting."  *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179

10  (2009).  She bases her argument that defendants owe her an uncertain sum of money on her right to

11  rescind under either TILA or California Civil Code section 1691.  As explained above, however,

12  even if Davenport were able to prove that she did not receive the requisite TILA disclosures, the

13  proper time frame under which she might rescind has passed.  Moreover, she has not adequately

14  pleaded a claim for rescission under California statutory law.  Her accounting claim must therefore

15  be dismissed with leave to amend.  Should she choose to amend, she is reminded that the TILA

16  rescission claim was dismissed without leave to amend.

17        C.   Civil Conspiracy: Third Claim for Relief

18        A conspiracy is not an independent cause of action, but is instead "a legal doctrine that

19  imposes liability on persons who, although not actually committing a tort themselves, share with the

20  immediate tortfeasors a common plan or design in its perpetration."  *Applied Equip. Corp. v. Litton*

21  *Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994).  Liability for civil conspiracy generally requires

22  three elements: (1) formation of a conspiracy (an agreement to commit wrongful acts); (2) operation

23  of a conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of a

24  conspiracy.  *Id.* at 511.  A civil conspiracy is therefore activated by the commission of an underlying

25  wrongful act.  *Id.*

26        Davenport theorizes that all defendants "knowingly and willfully conspired" to conceal the

27  fact that her loan would be securitized and, more broadly, to provide plaintiff with a loan she could

28

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

not afford. She does not provide sufficient facts to satisfy even the first element of civil conspiracy. She *concludes* the defendants agreed to hoodwink her with an unconscionable loan and, for support, points out that Litton collected payments each month, C-BASS mailed a notice of default, and U.S. Bank purchased her home at the foreclosure sale. As pleaded, it is simply not clear how any of these actions are unlawful, even if they may appear somewhat coordinated. The observation of "parallel conduct," the Supreme Court has instructed, combined with "the bare assertion of conspiracy" will not suffice. *Twombly*, 550 U.S. at 556-57. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* Davenport has not presented a claim for relief and the civil conspiracy cause of action is dismissed with leave to amend.

D.   Aiding and Abetting: Fourth Claim for Relief

As against all defendants save First Financial, Davenport imputes liability for the original lender's alleged "fraudulent business practices" including, for example, Kruger's overstatement of Davenport's monthly income on her loan application. (Compl. ¶ 72.) To hold them secondarily liable, she argues the remaining defendants "aided and abetted" First Financial. In California, a party "aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Berryman v. Merit Property Mgmt., Inc.*, 152 Cal. App. 4th 1544, 159 (2009). By contrast, "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting." *Austin B. v. Escondido Unified School Dist.*, 149 Cal. App. 4th 860, 879 (2007).

Davenport has not presented any facts to support her theory that, even assuming defendants could have known about Kruger's acts, they substantially assisted or encouraged Kruger. Again, she merely posits a legal conclusion. This claim, too, is dismissed with leave to amend.

E.   Theories of Agency, Vicarious Liability, Negligent Supervision: Fifth & Sixth Claims for Relief

United States District Court

For the Northern District of California

1    In her fifth and sixth claim for relief (respectively dubbed "negligent supervision" and

2  "agency"), Davenport essentially argues that Litton, U.S. Bank and C-BASS should be held

3  vicariously liable for First Financial's alleged torts or at least liable for "negligent" hiring and

4  supervision of that entity.  As to the argument that First Financial was an agent of the other

5  defendants, Davenport concludes but does not explain exactly how or why this Court should find

6  that First Financial was not its own, independent entity.  In California, "[t]he law indulges no

7  presumption that an agency exists but instead presumes that a person is acting for himself and not as

8  agent for another." *Walsh v. Am. Trust*, 7 Cal. App. 2d 654, 659 (1935).

9    "An agency is either actual or ostensible."  Cal. Civ. Code § 2298.  Agency is actual where

10  the "agent is really employed by the principal."  Cal. Civ. Code § 2299.  The Ninth Circuit has

11  instructed that the key factor to consider in analyzing whether an entity is an employer is "the right

12  to control and direct the activities of the person rendering service, or the manner and method in

13  which the work is performed." *Doe I v. Wal-mart Stores, Inc.*, 572 F.3d 677, 682-83 (9th Cir. 2009)

14  (*quoting Serv. Employees Int'l Union v. County of L.A.*, 225 Cal. App. 3d 761, 786 (1990)).  "A

15  finding of the right to control employment requires . . . a comprehensive and immediate level of

16  'day-to-day' authority over employment decisions." *Id.* (*quoting Vernon v. State*, 116 Cal. App. 4th

17  114, 131 (2004)).  Davenport concludes that the other defendants (presumably, all of them)

18  employed First Financial but presents no facts or evidence in support.

19    Where a "principal, intentionally or by want of ordinary care, causes or allows a third person

20  to believe the agent to possess" authority, the agency relationship is said to be "ostensible."  Cal.

21  Civ. Code § 2299.  Davenport's agency theory is tethered to the notion that the defendants' interests

22  in consummating the loan were aligned and the parties benefitted financially from the contract.  This

23  is not an argument that can impute an agency relationship.  As to her negligent supervision claim,

24  the legal theory arises where an employer negligently "hir[es] or retain[s] an employee who is

25  incompetent or unfit." *Phillips v. TLC Plumbing, Inc.*, 172 Cal. App. 4th 1207, 1214 (1997).

26  Again, without any facts to support the notion that First Financial was an employee of one or all

27

28

NO. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**United States District Court**
For the Northern District of California

1    defendants, this claim cannot survive a motion to dismiss.  The fifth and sixth claims for relief are,

2    accordingly, dismissed with leave to amend.

3           F.    <u>Breach of Fiduciary Duty: Ninth Claim for Relief</u>

4          Davenport asserts that First Financial breached a fiduciary duty it owed her; she further

5    contends that the remaining defendants may be held vicariously liable for this breach.  Defendants

6    correctly point out that no fiduciary duty ever arose.  "[A]s a general rule, a financial institution

7    owes no duty of care to a borrower when the institution's involvement in the loan transaction does

8    not exceed the scope of its conventional role as a mere lender of money."  *Nymark v. Heart Fed.*

9    *Sav. & Loan Ass'n*, 231 Cal. App. 3d 1089, 1098 (1991).  "A commercial lender is entitled to pursue

10   its own economic interests in a loan transaction.  This right is inconsistent with the obligations of a

11   fiduciary which require that the fiduciary knowingly agree to subordinate its interests to act on

12   behalf or for the benefit of another."  *Id.* at 1093 n.1.  Davenport has not shown the existence of a

13   fiduciary relationship or presented facts to suggest that First Financial acted outside the ordinary

14   scope of a commercial lender.  Accordingly, she cannot possibly impute vicarious liability to the

15   moving defendants and this claim is dismissed with leave to amend.

16          G.   <u>Due Process: Twelfth Claim for Relief</u>

17         In her twelfth claim for relief, Davenport argues that defendants failed to serve her properly

18   with notice of a trustee's sale and of foreclosure by registered or certified mail.  As discussed in the

19   California Civil Code sections 2924 and 2923.5 segment, Davenport does admit that she received

20   both notices in the mail and in a timely fashion.  It is not clear how a private bank's failure to certify

21   its mail denies her due process of law in any reasonable sense of the concept.

22         She also argues that, "Defendants unlawfully foreclosed on the Subject Property, in violation

23   of Plaintiff's Right to Due Process and that of the HAMP program."  (Compl. ¶ 127.)  "HAMP"

24   refers to a federal Homeowner Affordable Modification Program.  Apparently, the voluntary

25   program establishes guidelines that lenders should consider when reviewing a modification request.

26   It seems that her argument works something like this: because Litton apparently received federal

27   money for its agreement to participate in HAMP, it was required to follow the program's guidelines

28

NO. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1    on loan modifications.  Again, however, her reliance on the due process clause of the Fourteenth

2    Amendment is misplaced.  Even assuming Litton stepped outside of these federal guidelines, her

3    right to *due process* is not implicated.  This claim is dismissed without leave to amend.

4          H.   Intentional or Negligent Infliction of Emotional Distress: Eighteenth & Nineteenth

5               Claims for Relief

6          To present a claim for intentional infliction of emotional distress, a plaintiff must plead: (1)

7    defendant's extreme and outrageous conduct; (2) that defendant intended to cause, or recklessly

8    disregarded the probability of causing, emotional distress; (3) that plaintiff suffered severe or

9    extreme emotional distress; and (4) actual and proximate causation of the emotional distress by

10   defendant's outrageous conduct.  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001

11   (1993).  Outrageous conduct must be "so extreme as to exceed all bounds of that usually tolerated in

12   a civilized community."  *Id.* at 1001.  To succeed on her claim for negligent infliction of emotional

13   distress, Davenport must show serious emotional distress actually and proximately caused by

14   wrongful conduct on the part of a defendant who should have foreseen that the conduct would cause

15   such distress.  *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 155 (1987).

16         Common sense dictates that home foreclosure is a terrible event and likely to be fraught with

17   unique emotions and angst.  Where a lending party in good faith asserts its right to foreclose

18   according to contract, however, its conduct falls shy of "outrageous," however wrenching the effects

19   on the borrower.  Here, Davenport concludes but does not adequately present evidence of Litton, C-

20   BASS or U.S. Bank's bad faith in the foreclosure process.  The alleged certified mail failure and the

21   refusal, after meeting with her and her legal representative, to modify her loan also do not, by

22   themselves, qualify as outrageous or even indicative of bad faith.  Even under the auspices of her

23   negligence theory, she has not connected the mail failures to her distress or, for that matter,

24   suggested that any reasonable lender would foresee such harm.  Both claims are therefore denied

25   with leave to amend.

26         I.   Breach of the Implied Covenant of Good Faith and Fair Dealing: Thirteenth Claim for

27              Relief

28

United States District Court

For the Northern District of California

1    Davenport grounds her breach of the implied covenant of good faith and fair dealing claim in

2    contract, not in tort law.  Section 205 of the Restatement of Contracts states that, "[e]very contract

3    imposes upon each party a duty of good faith and fair dealing in its performance and its

4    enforcement."  Restatement (Second) of Contracts § 205 (2009).  "[T]he implied covenant of good

5    faith is read into contracts in order to protect the express covenants or promises of the contract, not

6    to protect some general public policy interest not directly tied to the contract's purpose."  *Carma*

7    *Dev., Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).

8    With regard to the defendants whose involvement centers on the loan foreclosure—Litton,

9    C-Bass and U.S. Bank—the loan agreements outlined the possibility of foreclosure should

10   Davenport fail to meet her agreed-upon payment obligations.  She does not deny she defaulted and

11   does not present any facts to demonstrate exactly how these defendants sought to obtain more from

12   her than that to which they were contractually entitled.  As a general matter, a court should not

13   "conclude that a foreclosure conducted in accordance with the terms of a deed of trust constitutes a

14   breach of the implied covenant of good faith and fair dealing."  *Id.* at 374-76.  The covenant does

15   not "impose any affirmative duty of moderation in the enforcement of legal rights."  *Price v. Wells*

16   *Fargo Bank*, 213 Cal. App. 3d 465, 479-80 (1989).  The mere fact that the remaining defendants

17   foreclosed on the Canterbury property does not without more constitute a breach of the covenant of

18   good faith and fair dealing.  This claim is dismissed as alleged against the moving defendants with

19   leave to amend.

20       J.   Unjust Enrichment: Seventeenth Claim for Relief

21   Davenport's seventeenth claim is one for "unjust enrichment."  Courts in this state and

22   district diverge on whether unjust enrichment functions as an independent claim or is instead an

23   effect that must be tethered to a distinct legal theory to warrant relief.  Some courts have read a

24   plaintiff's "claim" for unjust enrichment as a claim for relief.  *See, e.g.*, *Ghirardo v. Antonioli*, 14

25   Cal. 4th 39, 50 (1996) (recognizing that a plaintiff may advance a stand-alone claim for unjust

26   enrichment, particularly where he or she seeks restitution and other remedies are inadequate).  These

27   courts focus on whether the facts demonstrate a defendant's unjust receipt of some benefit.  Other

28

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

23

United States District Court

For the Northern District of California

courts cast unjust enrichment as an *effect*: it is simply the thing that needs remedying.  *See McKell v. Wash. Mut., Inc.*, 412 Cal. App. 4th 1457, 1489 (2006); *Melchior v. New Line Prod., Inc.*, 106 Cal. App. 4th 779, 793 (2003) ("The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.").

Under both views, the effect of unjust enrichment is remedied with some form of restitution.  *See, e.g.*, *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009) ("Unjust enrichment is commonly understood as a theory upon which the remedy of restitution may be granted."); Restatement of Restitution § 1 (1936) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").  A plaintiff advances a basis for obtaining restitution if he or she demonstrates defendant's receipt and unjust retention of a benefit.  *See Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000); *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662-63 (1992).  "The fact that one person benefits another is not, by itself, sufficient to require restitution."  *McBride v. Boughton*, 123 Cal. App. 4th 379, 389 (2004) (*quoting First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662 (1992)).  Instead, "[t]he person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it."  *Id.* (internal quotation marks and citations omitted).

The benefit of the narrower view is that it effectively delineates precisely what unjust enrichment means and how it works.  There are several factual scenarios where a theory of unjust enrichment has historically supported restitution as a remedy.  A plaintiff may, for example, advance a claim as an alternative to breach of contract when the parties have a contract that was procured by fraud or is for some reason unenforceable.  *See McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004).  Or, where the plaintiff cannot assert title or right to possession of particular property, but nevertheless can show just grounds for recovering money to pay for some benefit the defendant received from him, "the plaintiff has a right to restitution at law through an action derived from the common-law writ of assumpsit" (this method implies a contract at law, or a quasi-

contract).  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) ("Such claims were [historically] viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).").  Finally, a plaintiff may seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property "identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.*

Davenport's "unjust enrichment" theory does not fit into any of these categories.  She argues that because she had a valid right to rescind her loan under either TILA or California Civil Code section 1691 (in light or the alleged TILA violations and fraudulent income statement), all defendants improperly collected her monthly mortgage payments from the loan's inception.  These mortgage payments, she insists, "unjustly enriched" defendants.  Her theory *might* work if she validly exercised her rescission right under either statute and defendants failed to honor it and continued to collect payments from her.  This did not happen here, though, and she has not alleged that any the mortgage payments constituted an unjust benefit.  This claim must therefore be dismissed with leave to amend.

## V.  CONCLUSION

The defendants' motion to dismiss is resolved accordingly:

1.   The plaintiff's first, twenty-third, twenty-fourth, twenty-fifth and twenty-sixth claims for relief (declaratory judgment, set-aside sale, cancel trustee's deed, injunctive relief, and quiet title) are each based on an incorrect legal theory.  A trustee need not demonstrate physical possession of a promissory note to exercise its contractual right to foreclose on property.  These claims are dismissed without leave to amend.

2.   The fourteenth claim for relief (TILA) is time-barred.  Her claim for rescission is dismissed without leave to amend and her claim for statutory damages is dismissed with leave to amend.  Should she choose to amend, she must at a minimum allege facts in support of equitable tolling.

United States District Court

For the Northern District of California

3.  The fifteenth claim for relief (RESPA) is dismissed with leave to amend in the event that Davenport grounds her claim on sections of the statute which trigger a private right of action.

4.  Claims twenty through twenty-two (Elder Abuse, Fair Housing Act, and Equal Credit Opportunity Act) are dismissed with leave to amend.

5.  Claim eleven (Cal. Civ. Code § 2923.5) is dismissed with leave to amend.

6.  The tenth claim for relief (UCL) is dismissed with leave to amend.

7.  The thirteenth claim for relief (contractual breach of the implied covenant of good faith and fair dealing) is dismissed with leave to amend.

8.  Claims seven and eight (fraud and constructive fraud) are dismissed with leave to amend.

9.  Claim sixteen (rescission pursuant to Cal. Civ. Code § 1691) is dismissed with leave to amend.

10. The second claim (accounting) is dismissed with leave to amend.

11. Plaintiff's common law claims for civil conspiracy (third claim), aiding and abetting (fourth claim), negligent supervision (fifth claim), agency (sixth claim), unjust enrichment (seventeenth claim), intentional infliction of emotional distress (eighteenth claim), negligent infliction of emotional distress (nineteenth claim), and lack of due process (twelfth claim) are dismissed with leave to amend.

If Davenport wishes to amend the FAC, she must do so on or before September 2, 2010.  A Case Management Conference shall be held on **October 14, 2010 at 10:00 a.m.**  The parties shall submit a Joint Case Management Statement one week prior to the Conference.

IT IS SO ORDERED.

Dated: 07/16/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

No. C 10-0679 RS
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS